Saintume v Lamattina (2021 NY Slip Op 02004)





Saintume v Lamattina


2021 NY Slip Op 02004


Decided on March 31, 2021


Appellate Division, Second Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on March 31, 2021
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Second Judicial Department

REINALDO E. RIVERA, J.P.
CHERYL E. CHAMBERS
COLLEEN D. DUFFY
HECTOR D. LASALLE
BETSY BARROS, JJ.


2019-08214
 (Index No. 607217/15)

[*1]Lyonnel Saintume, respondent,
v
Elizabeth Lamattina, appellant.


Baxter Smith & Shapiro, P.C. (Saretsky Katz & Dranoff, LLP, New York, NY [Patrick Dellay and Eric Dranoff], of counsel), for appellant.
Rosner Russo Shahabian, PLLC, Uniondale, NY (Allen J. Rosner of counsel), for respondent.



DECISION & ORDER
In an action to recover damages for personal injuries, the defendant appeals from an interlocutory judgment of the Supreme Court, Nassau County (Arthur M. Diamond, J.), entered June 19, 2019. The interlocutory judgment, upon a jury verdict on the issue of liability finding the defendant to be 100% at fault in the happening of the accident, and upon an order of the same court dated May 6, 2019, denying the defendant's motion pursuant to CPLR 4404(a) to set aside the jury verdict and for judgment as a matter of law dismissing the complaint, or, in the alternative, for a new trial on the issue of liability, is in favor of the plaintiff and against the defendant on the issue of liability.
ORDERED that the interlocutory judgment is reversed, on the law, with costs, that branch of the defendant's motion which was pursuant to CPLR 4404(a) to set aside the jury verdict and for judgment as a matter of law dismissing the complaint is granted, and the order dated May 6, 2019, is modified accordingly.
The plaintiff, an exterminator, allegedly was injured on August 7, 2013, when he partially fell through the floor of an unfinished attic located in a home then owned by the defendant. At the liability trial, the plaintiff testified, in relevant part, that he was at the defendant's home to address a bee problem. After walking around the house and inspecting the outside, the plaintiff asked the defendant if he could go up into the attic. In order to get to the hatch leading to the attic, the plaintiff and the defendant had to clear a closet that was "packed with luggage and clothes and stuff like that." The plaintiff then climbed a ladder into the attic.
The plaintiff described the unfinished attic as consisting of large beams that he referred to as "main beams," and his trial counsel repeatedly referred to as "support beams" (hereinafter main beams), running parallel to each other from one side of the attic to the other, as well as smaller pieces of wood (hereinafter smaller pieces of wood), which the plaintiff described as "little pieces of beams on top, like holding some part of—I don't know—to hold the insulation [*2]there or whatever, but they put on top of the beams, you know, but not really close enough, you know, very shattered, you know."
After spending approximately 25 minutes in the attic, walking on the main beams, the plaintiff stepped onto one of the smaller pieces of wood. The plaintiff did not know whether the smaller piece of wood was intended to be walked on, but it was wide enough to place his foot on it. Upon doing so, however, the smaller piece of wood gave way and the plaintiff's leg went through the insulation and the layer of sheetrock underneath. He was able to break his fall by holding onto the main beams.
After the accident, the plaintiff observed the broken smaller piece of wood, and when asked to describe what he saw, he answered: "It's like up there, you know, but I don't really—I saw the beams there, but I never really, you know—that day when I saw the beams, my main concern was to get down, you know, yes." When pressed further by his own counsel, and over the defendant's objection, he added that the smaller piece of wood that broke was "discolored" and "pretty damp."
After the accident, the defendant cleaned up the debris that had fallen through the hole in the ceiling caused by the plaintiff's fall. She found no wood, but only little pieces of sheetrock and insulation. The insulation was pink—not discolored—and the sheetrock was dry.
Prior to the accident, the defendant had not looked into the attic for "several years." However, she testified that workmen regularly went into the attic "once a year, maybe once every two years" to service the central air conditioning unit. She never had any problems with condensation or leaking from the air conditioning unit, and never observed any discoloration or staining on the ceiling from water damage.
The jury returned a verdict in favor of the plaintiff, finding the defendant 100% at fault in the happening of the accident. The defendant subsequently moved pursuant to CPLR 4404(a) to set aside the jury verdict and for judgment as a matter of law dismissing the complaint, or, in the alternative, for a new trial on the issue of liability. The Supreme Court denied that motion in an order dated May 6, 2019, and subsequently entered an interlocutory judgment upon the verdict and the order. The defendant now appeals from the interlocutory judgment.
For a court to conclude as a matter of law that a jury verdict is not supported by sufficient evidence, it must find that there is simply no valid line of reasoning and permissible inferences which could possibly lead rational persons to the conclusion reached by the jury on the basis of the evidence presented at trial (see Cohen v Hallmark Cards, 45 NY2d 493, 499; Allen v Federation of Jewish Philanthropies of N.Y., 175 AD3d 1226, 1228; Barril v McClure, 163 AD3d 752, 752-753).
As a threshold matter, the defendant had no duty to warn the plaintiff against the readily observable hazards posed by an unfinished attic (see Meyer v Tyner, 273 AD2d 364; Johnson v Summa, 230 AD2d 633; Zaffiris v O'Loughlin, 184 AD2d 696). The plaintiff readily acknowledged, for instance, that he could "definitely not" step on the sheetrock. Thus, if the accident was the result of the plaintiff stepping outside of the areas where it appeared reasonably safe for him to walk, the defendant should bear no liability (see Meyer v Tyner, 273 AD2d 364; Johnson v Summa, 230 AD2d 633; Zaffiris v O'Loughlin, 184 AD2d 696). Conversely, if the plaintiff stepped on something that appeared reasonably safe to walk on but in fact was not, then the defendant could be held liable for such a latent hazard (see Gallardo v Gilbert, 153 AD3d 791; Slomin v Skaarland Constr. Corp., 207 AD2d 639).
"[T]he issue of whether a hazard is latent or open and obvious is generally fact-specific and thus usually a jury question" (Tagle v Jakob, 97 NY2d 165, 169). However, in order to meet his prima facie burden of proof at trial, the plaintiff was required to submit sufficient evidence to enable the jury to decide this critical issue in a logical manner, based on the inferences to be drawn from the evidence, rather than through sheer speculation or guesswork (see generally Grant v Phenix Ins. Co. of Brooklyn, N.Y., 133 NY 657; see also Castellano v New York City Transit [*3]Auth., 38 AD3d 822, 823). Here, the evidence showed that the main beams were part of the structure of the house, but the function of the smaller pieces of wood was never really made clear, except that the plaintiff offered that they may have been intended to hold the insulation in place. In fact, the jury heard next to nothing about the smaller piece of wood that allegedly caused the plaintiff to fall. There were no pictures of it, no testimony regarding its dimensions, no evidence as to whether such a smaller piece of wood would ordinarily be safe to walk on, no evidence as to whether the smaller piece of wood even appeared reasonably safe to walk on, and no evidence that the smaller piece of wood was in a rotted, deteriorated, or otherwise unsafe condition, other than the plaintiff's testimony that it looked "discolored" and "pretty damp."
Viewing the evidence in the light most favorable to the plaintiff, and affording him every favorable inference which may properly be drawn from the facts presented, there was simply no rational basis upon which the jury could determine, without speculating, that the smaller piece of wood that allegedly caused the plaintiff to fall constituted a latent hazard due to its alleged rotted condition (see Dodkowitz v Nelson, 22 AD3d 709). Our colleagues in the dissent reach a different conclusion, based largely on the plaintiff's testimony, on redirect examination, that he had extensive experience walking on "joist beams." While it is true that the plaintiff and his counsel often—and confusingly—referred to the smaller pieces of wood as "joists," there was no evidence that the smaller pieces of wood were, in fact, part of the structure of the house. To the contrary, as mentioned earlier, the plaintiff himself offered that the purpose of the smaller pieces of wood was simply to hold the insulation in place, and when asked directly whether the smaller pieces of wood were intended to be walked on, the plaintiff said he didn't know. Our colleagues in the dissent also state that, prior to the accident, the plaintiff had spent 30 minutes in the attic walking on the smaller pieces of wood without incident, but again there is no clear record support for this statement. Whether the plaintiff had previously stepped on some of the smaller pieces of wood without incident prior to the accident is simply not known, because the plaintiff's counsel never asked him that question directly. Rather, counsel asked the plaintiff whether, in his 20 years of experience, he had ever walked on "joist beams," to which the plaintiff answered "[y]es," "[a]ll the time." But since there is no record evidence that the smaller pieces of wood were, in fact, joists, the plaintiff's testimony does not permit an inference that the small pieces of wood were part of the structure of the house.
Our colleagues in the dissent also make much of the plaintiff's testimony that the lighting in the attic was "very dim." However, the plaintiff testified that there was a functioning light in the attic, and he also had a flashlight with him which he used throughout his inspection of the attic. More importantly, the plaintiff's counsel never suggested in his opening statement, on summation, or even on appeal, that the accident occurred, in whole or in part, because the plaintiff could not adequately see where he was stepping.
Moreover, even assuming that the plaintiff established that the smaller piece of wood on which he stepped constituted a latent hazard, he failed to present sufficient evidence for the jury to conclude that the defendant had actual or constructive notice of such defect (see Gordon v American Museum of Natural History, 67 NY2d 836, 837-838; Dodkowitz v Nelson, 22 AD3d 709).
Accordingly, the Supreme Court should have granted that branch of the defendant's motion which was pursuant to CPLR 4404(a) to set aside the jury verdict in favor of the plaintiff and against her and for judgment as a matter of law dismissing the complaint.
RIVERA, J.P., CHAMBERS and LASALLE, JJ., concur.
DUFFY, J., dissents, and votes to affirm the interlocutory judgment, with the following memorandum, in which BARROS, J., concurs:
The plaintiff, an exterminator, commenced this action against the defendant to recover damages for injuries he alleged that he sustained in August 2013 when he was inspecting the attic of a home then owned by the defendant. At the time of the incident at issue, the defendant lived alone in the home and had sought exterminating services due to a concern about bees in the home. [*4]According to the plaintiff, he had been performing an inspection of the attic when suddenly a rotted piece of wood on which he was walking in the defendant's unfinished attic broke, causing him to fall, up to his waist, through the insulation and the sheetrock of the ceiling of the room below.
At the trial on the issue of liability, the plaintiff testified, in relevant part, that, on the date at issue, he was at the defendant's home inspecting for bees and that he had inspected outside the house and saw no bees. He said that the defendant then told him that the bees were coming out of a light fixture in one of the rooms. He inquired if she had an attic, and she showed him the entrance to the attic—a hatch in the back of one of the closets. According to the plaintiff, in order to access the attic, he helped the defendant clear a closet that was "packed with luggage and clothes and stuff like that."
The plaintiff testified that he then obtained a ladder to enter into the attic and that, although there was a light fixture that he pulled to turn on, he was unable to see. According to the plaintiff, even with the light, the attic, which was "pretty big," was dimly lit and there were parts that he could not see even with his flashlight. He described the attic floor as not finished and that it consisted of parallel beams, which he called "main beams" (hereinafter main beams), running from one side of the attic to the other, except for the location where an air conditioning unit (hereinafter the AC unit) was placed. He testified that the AC unit was approximately 10 feet from the entrance to the attic and that, at the site of the AC unit, the floor "kind of made a square to place [the AC unit] there."
The plaintiff also said that the main beams of the attic were located approximately one or two feet apart from each other and that there were smaller pieces of wood (hereinafter smaller beams) that varied in distance from each other running in a perpendicular direction over the top of the main beams. The plaintiff testified that there was insulation between the main beams and under the smaller beams.
According to the plaintiff, after spending approximately 25 minutes inspecting the perimeter of the attic, he found no bees and decided to leave the attic. He testified that his inspection had consisted of looking into the corners of the attic for bees, crossing from one corner to another, and that he was able to hold on to some beams that were above him while he walked. He testified that, as he was moving towards the entrance to the attic, he was walking in an area of the attic that he had not inspected, when suddenly he heard "POW" and he felt himself "plunging down" through the floor. The plaintiff testified that he opened both arms and grabbed onto the main beams which prevented his entire body from falling through the floor. After he fell, he saw that one of the smaller beams was rotted and had snapped, causing him to fall. He testified that, after he fell, he saw the two pieces of broken wood that remained. At that time, he also saw that the smaller beam that had broken and the insulation around it were discolored and "pretty damp." He also testified that the area around the AC unit was "pretty damp," and that damp and discolored area encompassed an area of "about five to ten feet."
On cross-examination, the plaintiff testified that, in his 20 years of working, he had walked on smaller beams, which are "just wood on the floor"; he also testified that the smaller beam at issue was wide enough to place his foot on and he had been walking on the smaller beams in the attic before the one at issue snapped and his leg went through the insulation and the layer of sheetrock underneath.
According to the defendant, prior to the accident, she had not looked into the attic for "several years," and she never looked in the attic after the accident. The defendant testified that workmen would regularly go into the attic "once a year, maybe once every two years" to service the AC unit. Although the defendant lived alone at the time of the accident, she testified that in the past, when she had lived in the house with her husband, he would go up to the attic "maybe once a month, maybe once every two months. Just to look up there and see." Also, according to the defendant, she provided the plaintiff with a ladder to enter the attic. The defendant testified that she never had any problems with condensation or leaking from the AC unit, and never observed any discoloration or staining on the ceiling from water damage and did not see any damp insulation or wood debris from [*5]the hole caused by the plaintiff's fall. However, she also testified on direct examination that she did not know whether any beams were broken or whether there was rotted wood in the area near the AC unit at the time the plaintiff's accident occurred. The defendant acknowledged that in the 30-year period that she had lived in the home, no maintenance was performed on the attic and she did not inspect it.
The defendant also presented as a witness the person who repaired and repainted the sheetrock in the damaged area of the ceiling of the room below the attic caused by the plaintiff's fall. According to that witness, although he did not go into the attic, the smaller beam that broke could not have been rotted since he would not have been able to nail new sheetrock into a rotted beam. On cross-examination, the witness stated that sheetrock was attached to main beams, and admitted that he did not know whether the beam that the plaintiff alleged had broken had been a main beam or a smaller beam, and that a smaller beam would not have to be replaced in order to attach new sheetrock.
After the parties rested, the Supreme Court charged the jury, among other things, that the plaintiff alleged that the premises were not in a reasonably safe condition because there was a rotted beam in the attic which caused him to fall and get injured, and that the defendant contended that there was no such rotted beam. The court informed the jury that the first question to answer was whether the attic was in reasonably safe condition when the plaintiff entered it. The court also instructed the jury that, if they answered no to that question, in deciding whether the defendant was negligent, they had to decide whether the defendant created or either knew or in the use of reasonable care should have known that the rotted beam existed. The court also instructed the jury that, if they found that the defendant's negligence was a substantial factor in causing the plaintiff's injury, it should also consider whether "the condition which was the rotted beam was open and obvious, . . . in deciding whether the plaintiff was also at fault for causing his injuries."
The jury thereafter returned a verdict in favor of the plaintiff, finding the defendant 100% at fault in the happening of the accident. The defendant subsequently moved pursuant to CPLR 4404(a) to set aside the jury verdict and for judgment as a matter of law dismissing the complaint, or, in the alternative, for a new trial on the issue of liability. In an order dated May 6, 2019, the Supreme Court denied the motion, and thereafter entered an interlocutory judgment upon the verdict and the order. The defendant appeals from the interlocutory judgment.
A court must deny a motion pursuant to CPLR 4404(a) to set aside a jury verdict and for judgment as a matter of law unless it can conclude, as a matter of law, that the verdict is not supported by sufficient evidence (see Cohen v Hallmark Cards, 45 NY2d 493, 499; Allen v Federation of Jewish Philanthropies of N.Y., 175 AD3d 1226, 1228). In order to find that a verdict is unsupported by the evidence, a court must find that there is simply no valid line of reasoning and permissible inferences which could possibly lead rational persons to the conclusion reached by the jury on the basis of the evidence presented at trial (see Cohen v Hallmark Cards, 45 NY2d at 499; Allen v Federation of Jewish Philanthropies of N.Y., 175 AD3d at 1228). Here, we agree with the Supreme Court's determination denying the defendant's motion since, viewing the evidence in the light most favorable to the plaintiff, and affording him every favorable inference which may properly be drawn from the facts presented, there is a valid line of reasoning and permissible inferences that could lead rational individuals to the jury's conclusion that the defendant was negligent in failing to maintain the premises in a reasonably safe condition and that her negligence was a substantial factor in causing the plaintiff's accident (see Allen v Federation of Jewish Philanthropies of N.Y., 175 AD3d at 1229).
"In order for a landowner to be liable in tort to a plaintiff who is injured as a result of an allegedly defective condition upon property, it must be established that a defective condition existed and that the landowner affirmatively created the condition or had actual or constructive notice of its existence" (Lezama v 34-15 Parsons Blvd, LLC, 16 AD3d 560, 560; see Walsh v Super Value, Inc., 76 AD3d 371, 375). A defendant has constructive notice of a dangerous or defective condition on property when the condition is visible and apparent, and has existed for a sufficient length of time to afford the defendant a reasonable opportunity to discover and remedy it (see [*6]Gordon American Museum of Natural History, 67 NY2d 836, 837-838). "Liability for injuries that occur on remote or rarely frequented parts of premises [such as attics] depends upon whether a plaintiff's presence was foreseeable in light of the frequency of the use of the area where the injuries were sustained and is generally a question for the jury" (NY PJI 2:90.1). Likewise, "where . . . 'an object capable of deteriorating is concealed from view, a property owner's duty of reasonable care entails periodic inspection of the area of potential defect'" (Hoffman v United Methodist Church, 76 AD3d 541, 542, quoting Hayes v Riverbend Hous. Co., Inc., 40 AD3d 500, 501). "[T]he issue of whether a hazard is latent or open and obvious is generally fact-specific and thus usually a jury question" (Tagle v Jakob, 97 NY2d 165, 169). "Moreover, '[a] condition that is ordinarily apparent to a person making reasonable use of his or her senses may be rendered a trap for the unwary where the condition is obscured or the plaintiff is distracted'" (Villano v Strathmore Terrace Homeowners Assn., Inc., 76 AD3d 1061, 1062, quoting Shah v Mercy Med. Ctr., 71 AD3d 1120, 1120).
As an initial matter, the plaintiff provided the only direct evidence as to the condition of the attic on the day of the accident. Neither the defendant nor her witness went into the attic any time in proximity to the accident, either before or after, and could testify only to that which they each observed from looking up at the hole in the sheetrock of the ceiling in the room below the attic. Indeed, the defendant admitted she did not know if there was a rotted beam in the attic or if there was any broken wood in the attic at the time the plaintiff fell. Thus, viewing the evidence in the light most favorable to the plaintiff, his testimony regarding the cause of his fall—namely a "pretty damp" and discolored smaller beam that was then characterized as "rotted"—was not contradicted, and enabled the jury to determine that there was a dangerous condition in the defendant's attic which caused him to be injured. And, since the defendant testified that she did not know whether there was dampness or a rotted beam in the attic, the jury was within its discretion to reject her testimony that she did not see any dampness or discolored insulation in the hole that resulted from the plaintiff's fall or any wood in the debris that fell, and instead accept the plaintiff's testimony that he had been walking on smaller beams in the dimly lit attic when he suddenly heard "POW," fell, and thereafter saw a damp and discolored smaller beam in two pieces.
There is also a valid line of reasoning and permissible inferences that allowed the jury to accept the plaintiff's conclusion that the wood that snapped in two was rotted—caused by the dampness observed by the plaintiff and manifested by discoloration and the fact that the smaller beam broke in that area of the attic where the wood and insulation was damp and discolored (see e.g. Hoffman v United Methodist Church, 76 AD3d at 541 [finder of fact could infer that a wooden step had detached due, in whole or part, to screws or nails that had become rusty over time and discolored the wood which could no longer adequately support weight]).
Since the plaintiff testified that he observed an area of approximately 5 to 10 feet near the AC unit that had damp and discolored wood and insulation, the jury also could logically conclude that the dangerous condition of a rotted beam had existed long enough for the defendant to have discovered it upon reasonable inspection, but that the defendant failed to do such an inspection (see id.). Indeed, the defendant admitted that she had not been up in the attic in years and that she did not check the attic after the accident.
The jury also was able to weigh and credit the plaintiff's testimony about the dimly lit nature of the attic—how he could not see the entire attic even with the light and his flashlight—and that he had been inspecting the corners of the attic and had not inspected the area where he fell when evaluating the plaintiff's role in the happening of the accident and rejecting the defendant's contention that the plaintiff should have seen that the smaller beam at issue was not safe to walk upon (see Baron v 305-323 E. Shore Rd. Corp., 121 AD3d 826, 827-828; Shah v Mercy Med. Ctr., 71 AD3d at 1120).
The jury also was within its discretion in accepting as credible the plaintiff's testimony, that, in his 20 years of working, he had walked on smaller beams without incident and had been walking on such smaller beams in the defendant's attic before he began to leave. Given this evidence, together with the plaintiff's testimony about the rotted beam that broke, including the approximately 5 to 10 foot area of wood and insulation in the attic that was "pretty damp" and [*7]discolored, the dim lighting in the attic, and the fact that the plaintiff previously had not been in the area in which he fell, as well as the defendant's admission that she had not been in the attic in years, the jury was within its discretion to find the defendant 100% at fault in the happening of the accident.
In reversing the jury's verdict, I submit that my colleagues in the majority have adopted the defendant's view of the evidence, have not considered the facts in the light most favorable to the plaintiff, and have failed to afford the plaintiff the reasonable inferences to which he is entitled. For example, my colleagues in the majority point out that although the plaintiff testified that the lighting in the attic was dim, the plaintiff also had a flashlight and there was a functioning light in the attic. My colleagues' emphasis on the flashlight and light ignores the plaintiff's testimony—which is the only evidence in the record—about the lighting conditions in the attic. The plaintiff expressly described those conditions as follows:
"Q: So once you were in the attic, were you able to see up there?
A: No.
Q: Were there any lights up there?
A. Yes. There was a light fixture there. . . .
Q: Did that light up the whole attic, part of the attic?
A: No, no. It was a very dim, very dim light.
. . .
A: Yeah, pretty big attic. . . . There are parts I could not even see from a distance, even
with both a flashlight, you know."
My colleagues in the majority emphasize that the plaintiff's counsel did not focus on the dim lighting either in his opening statement or summation. Irrespective, the jury heard the plaintiff's testimony about the dim lighting conditions in which he was working in the attic and the plaintiff is entitled to the reasonable inferences the jury was able to make in light of this testimony. Notably, the lighting condition in the attic may have been important to the jury's analysis about the reasonableness of the plaintiff's actions as well as whether the hazard at issue was readily observable. Indeed, all six jurors determined that, based on the evidence, the defendant's premises were not in a reasonably safe condition at the time the plaintiff entered the attic.
Further, when my colleagues in the majority maintain that "the jury heard next to nothing about the smaller piece of wood that allegedly caused the plaintiff to fall," and state that "[t]here were no pictures of it, no testimony regarding its dimensions," they adopt, in large measure, the closing argument posited to the jury by defense counsel—which the jury rejected. My colleagues in the majority also maintain that there is no evidence that the joist beams described by the plaintiff are part of the structure of the house. These assertions ignore the plaintiff's testimony in which he described the attic and specifically described the wood at issue as a joist beam—which the jury was entitled to—and did—accept as true (see Elwood v Western Union Tel. Co., 45 NY 549, 553 [general rule that, where unimpeached witnesses testify distinctly and positively to a fact and are uncontradicted, their testimony should be credited], citing Lomer v Meeker, 25 NY 361, 363 ["[t]he positive testimony of an unimpeached, uncontradicted witness cannot be disregarded"]; see also Mendoza v Levy, 111 App Div 449, 451 [where evidence by a party is not contradicted by direct evidence nor any legitimate inferences from the evidence and is not opposed, there is no reason to deny its conclusiveness]).
Indeed, my colleagues in the majority adopt the defendant's characterization of the joist beam at issue as "a smaller piece of wood" although the plaintiff never described it as such; and disregard the plaintiff's description of it, to wit, that it was a smaller beam or a joist beam which crossed over the larger main beams, maintaining that the plaintiff "often—and confusingly" described the wood at issue as a joist. In fact, the plaintiff, for whom English was his second language, was consistent in describing the beam as a joist beam or smaller or little beam. Indeed, the plaintiff provided the only evidence about the condition of the attic. He described it to the jury as follows:
"Q: Okay. So can you describe the floor of the attic; was it finished, not finished? How
would you describe it?
A: Not finished.
Q: Okay.
A: Just beams.
Q: Okay. When you say "beams," what do you mean by that? Could you explain it to
the jury.
A: I mean, main beams going parallel to each other and some little pieces of beams on
top, like holding some part of—I don't know—to hold the insulation there or whatever, but they put on top of the beams, you know, but not really close enough, you know, very shattered [sic], you know.
. . .
Q: And those smaller beams, were they perpendicular to the main beams or something
else?
A: They just cross over them, yes.
Q: Were those the same size as the main beams?
A: No, no.
Q: Were they bigger? Were they smaller?
A: Smaller.
Q: Describe it.
A: Smaller.
Q: And those beams that—not the main beams, those other beams, were they the same
distance apart or did this vary?
A: No, no, it varied. They're shattered [sic], you know, not in order.
. . .
Q: So, would you call those . . . beams that were perpendicular joist beams?
A: Yes.
. . .
Q The beam that broke, was that one of the main beams or was that one of the joist
beams?
A: Joist beams, yes.
. . .
Q: So what was still in the attic after the accident happened?
A: I saw the two piece of—pieces of wood kind of attached in there and that was it, you
know. I don't—
Q: So most of the joist beam was still attached in the attic?
A: Yes, yes, yes, there was.
. . .
Q: The joist beams that you told us about spanned the entire distance between the two
rafters, correct?
A: Yes.
Q: And you told us that it snapped and completely broke apart, correct?
A: Yes. Some of them are longer because, like I said, there are different sizes up there.
Some of them go across, you know. Couple of them—some of them, just the two, you know, it's shattered [sic], you know."
The characterization of the record by my colleagues in the majority—maintaining that [*8]"[a]fter spending approximately 25 minutes in the attic, walking on the main beams, the plaintiff stepped onto one of the smaller pieces of wood"—is another example of my colleagues' failure to accord the plaintiff the favorable inference to which he is entitled. The plaintiff credibly testified that he had extensive experience in walking through attics such as the one at issue; he testified that he had 20 years experience in the field. When asked whether, in those 20 years, he had ever walked on the joist beams about which he had earlier testified, the plaintiff testified as follows:
"Q: So walking through attics, that's something you sort of learned to do on the job?
A: Yes, yes, yes, yes.
Q: And in 20 years, did you ever walk on the joist beams?
A: Yes.
Q: Sometimes, all the time?
A: All the time because that's what I do every day."
The plaintiff also testified that he had spent approximately 30 minutes in the attic and, in refuting the defendant's description of the joist beam at issue as "the small piece of wood," the plaintiff testified:
"A: Wide enough to put my foot on because I've been walking on them. I was walking
—I've been walking on them, you know, high beams. Depends on where I am in the attic, you know. Sometimes the big beams in front of me, that accessible. Sometimes it's the joist beams that can make me cross over and do my job."
The plaintiff also testified that the joist beams were "just wood on the floor. I'm walking on the woods."
Thus, the jury was entitled to infer that, during the approximately thirty minutes that he had been in the attic before the accident, the plaintiff had been walking on the joist beams without incident.
My colleagues in the majority again deprive the plaintiff of the reasonable inferences to which he is entitled by maintaining that the jury heard no evidence as to whether the "smaller piece of wood would ordinarily be safe to walk on," or evidence that it "even appeared reasonably safe to walk on." The plaintiff's testimony that he had been trained to work in unfinished attics and had been walking on joist beams such as the joist beam at issue during his 20 years of experience allowed the jury to reasonably infer that—absent its defective condition—the joist beam was safe to walk on.
In short, the jury evaluated the testimony of the plaintiff, a Haitian immigrant who learned English after he arrived in the United States, and concluded that the attic was unsafe because a joist beam—the same kind of beam that the plaintiff had safely walked on in unfinished attics during his 20 years as an exterminator and had been walking on before the accident, snapped after the plaintiff stepped on it in the dimly lit attic. The plaintiff's testimony that, after he fell, he observed that the broken wood was wet and the insulation nearby was discolored, and that a 5 to 10 foot area near the air conditioning unit was damp and the insulation was discolored, was sufficient to support the jury's determination that the defendant should have known about the dangerous condition.
In sum, contrary to the conclusion of my colleagues in the majority, I submit that there was sufficient evidence at trial, viewed in the light most favorable to the plaintiff, to support the verdict in favor of the plaintiff and against the defendant. Further, contrary to the defendant's contention, I find that the verdict was based on a fair interpretation of the evidence and thus was not against the weight of the evidence (see Nicastro v Park, 113 AD2d 129, 134). Accordingly, I would affirm the interlocutory judgment.
ENTER:
Aprilanne Agostino
Clerk of the Court